## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**INTEX RECREATION CORP.,**            )
                                       )
                    Plaintiff,         )
                                       )
            v.                         )            **Civil Action No.  01-1213 (JDB)**
                                       )
**METALAST, S.A.** Sociedad            )
Unipersonal,                           )
                                       )
                    Defendant.         )
_____)

### MEMORANDUM OPINION

This long-pending action concerns the alleged infringement of a patent on a ladder designed mainly for use in swimming pools.  The Court held a claim construction hearing on October 11, 2002, and subsequently issued a memorandum opinion construing the patent claim at issue.  See Intex Recreation Corp. v. Metalast, S.A., 245 F. Supp. 2d 65, 79 (D.D.C. 2003) ("Intex I").  In a subsequent opinion, the Court entered summary judgment in favor of Metalast on the issue of patent validity, entered summary judgment in favor of Intex on the issue of literal infringement, and permitted further briefing on Metalast's claim that Intex infringed on Metalast's patent under the doctrine of equivalents.  Intex Recreation Corp. v. Metalast, S.A., slip op. (D.D.C. May 20, 2005) ("Intex II") (2005 WL 1214600).  Presently before the Court is Intex's motion for summary judgment on the final issue remaining in this case -- whether Intex's product infringes on defendant's patent under the doctrine of equivalents.  In response, Metalast asks the Court to reconsider its decision on the construction of the claim based on the intervening judicial decision in Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and also to revisit the issue of literal infringement.  After a careful review, the Court concludes that its claim construction opinion is consistent with Phillips and that Intex is entitled to summary judgment.

**BACKGROUND**

The underlying facts of this case have been articulated at length in the prior opinions and are repeated here only as relevant to the issues now before the Court.  Metalast, a Spanish corporation, is the owner of U.S. Patent No. 5,547,041 ("the '041 patent") directed to the means for attachment of the steps of a ladder to the vertical uprights.  See '041 Patent Abstract  (Intex's Mem., Ex. 1).[1]  A characteristic trait of the ladder includes, inter alia, tubular apertures near the ends of each rung defined by a sleeve for receiving the vertical uprights.  Id.

The issue of patent infringement turns on the meaning of the phrase "uninterrupted inner surfaces" -- a phrase used in Claim 1 of the '041 patent to describe the inner surfaces of the rung sleeves.[2]  On February 12, 2003, the Court entered a decision stating that "the term 'uninterrupted inner surfaces' in the '041 patent shall be construed as meaning 'smooth' or 'uniform' inner

---

[1]  For ease of reference, the Court will refer to Intex's memorandum in support of its July 22, 2005 motion for summary judgment as "Intex's Mem.," and Metalast's August 30, 2005 memorandum in opposition to Intex's motion for summary judgment as "Metalast's Mem."

[2]  Claim 1 states in full that:

What is claimed is:
    1.  A ladder comprising two elongated and vertically extending, rigid uprights, each having at least one axially extending recess portion;
        at least one rung extending horizontally between said two uprights and having apertures defined by sleeves having uninterrupted inner surfaces for receiving therethrough said rigid uprights; and
        a means for securing said rungs to said uprights comprising an elongated split sleeve in coaxial alignment around one of said uprights, said split sleeve having a protrusion on an inner edge for engaging with said axially extending recess portion and wherein said sleeve of said rung slides over said split sleeve aligned on around said upright, to secure said rung in position along the length of said rigid upright.

'041 Patent, col. 2, lines 26-39 (emphasis added).

surfaces." Intex I, 245 F. Supp. 2d at 79.  The Court explained in detail that, in reaching this interpretation, the Court had rejected the interpretation of "uninterrupted" as a "unitary" one-piece rung sleeve -- the competing interpretation advanced by Metalast – and instead concluded that Intex's interpretation focusing on the "smooth" or "uniform" character of the inner surfaces was more consistent with the claim language, context, drawings, dictionary definitions, and expert testimony. Id. at 71-73, 79.  The Court thus construed the claim "uninterrupted" inner surface as a surface "having no gaps, protrusions, or recesses." Id. at 71, 72, 73.  The pending arguments regarding claim construction and infringement are presented in light of the Court's construction of Claim 1.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)).  The summary judgment standard is applicable in patent cases, as it is in any other case. See Desper Prods., Inc. v. QSound Labs, Inc., 157 F.3d 1325, 1332 (Fed. Cir. 1998).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed. R. Civ. P. 56(c))).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## ANALYSIS

Intex asserts several grounds in support of its request for summary judgment on the issue of infringement under the doctrine of equivalents, including prosecution history estoppel, the rule against vitiation of claim terms, and a showing on the merits that the differences in the relevant ladder designs are not insubstantial.  Before addressing the doctrine of equivalents, however, the Court first must address the threshold issue raised by Metalast's response brief -- whether this Court's earlier claim construction decision should be reconsidered in light of the recent Phillips decision from the en banc Federal Circuit.

I.    Consistency of the Claim Construction Decision With *Phillips v. AWH Corp.*

Metalast contends that the Court's construction of "uninterrupted inner surfaces" is based on an erroneous "dictionary-based" methodology that has recently been rejected by the Federal Circuit sitting en banc in Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005).  Metalast's

argument is based on the characterization of the claim construction opinion as applying a "presumption" that the dictionary definition of a term would govern in the absence of "clear, explicit direction in the claim specification or prosecution history."  Metalast Mem. at 1.  The Court agrees that <u>Phillips</u> clarifies the law on the role of dictionary definitions in the claim construction process.  <u>See</u> 415 F.3d at 1312 ("We have also previously considered the use of dictionaries in claim construction.  What we have said in that regard requires clarification."). Moreover, the Court believes that in so doing, the Federal Circuit necessarily overruled those cases applying a presumption that dictionary definitions govern unless refuted by intrinsic evidence such as the claim specification and prosecution history.  However, this Court's claim construction opinion is consistent with the principles articulated in <u>Phillips</u> and assigns an appropriate secondary role to dictionary definitions -- that is, one of confirming a construction of the claim derived in the first instance from the claim language and patent specification.  To the extent there is any doubt about that, this opinion confirms that secondary role for dictionary definitions.

In <u>Phillips</u>, the Federal Circuit discussed the differing roles of intrinsic and extrinsic evidence, and reiterated the continued validity of its prior precedent on claim construction -- particularly <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576 (Fed. Cir. 1996) -- that focused first on the claim language and the patent specification:

> [T]he claims themselves provide substantial guidance as to the meaning of particular claim terms.  <u>See</u> <u>Vitronics</u>, 90 F.3d at 1582; <u>see</u> <u>also</u> <u>ACTV, Inc. v. Walt Disney Co</u>,, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms").
>             . . .

> The claims, of course, do not stand alone. Rather, they are part of "a fully
> integrated written instrument," Markman, 52 F.3d at 978, consisting principally of
> a specification that concludes with the claims. For that reason, claims "must be
> read in view of the specification, of which they are a part." Id. at 979. As we
> stated in Vitronics, the specification "is always highly relevant to the claim
> construction analysis. Usually, it is dispositive; it is the single best guide to the
> meaning of a disputed term." 90 F.3d at 1582.

Phillips, 415 F.3d 1314-15. These principles are well-accepted, and indeed, were reiterated in

Intex I. See 245 F. Supp. 2d at 68-69 (quoting Vitronics, 90 F.3d at 1582).

The Phillips court next discussed the importance of prosecution history as intrinsic

evidence that may inform the meaning of claim language, but also noted the limitations of

prosecution history:

> Like the specification, the prosecution history provides evidence of how the PTO
> and the inventor understood the patent. . . . Yet because the prosecution history
> represents an ongoing negotiation between the PTO and the applicant, rather than
> the final product of that negotiation, it often lacks the clarity of the specification
> and thus is less useful for claim construction purposes. . . . Nonetheless, the
> prosecution history can often inform the meaning of the claim language by
> demonstrating how the inventor understood the invention and whether the
> inventor limited the invention in the course of prosecution . . . .

Phillips, 415 F.3d at 1317 (citations omitted).

The Federal Circuit then addressed the role of extrinsic evidence -- dictionaries, as well as

other types (e.g., expert and inventor testimony and treatises). Id. Extrinsic evidence should

only be considered "in the context of the intrinsic evidence," but remains a permissible secondary

aid in helping the court determine what a person of ordinary skill in the art would understand

claim terms to mean. Id. at 1319. In this context, the court reconsidered the precedent

established by Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193 (Fed. Cir. 2002), the

"leading case" in a series of cases establishing a presumption in favor of dictionary definitions.

Phillips, 415 F.3d at 1319.  Under the Texas Digital approach, the presumption could be overcome only where the patentee explicitly set forth a different definition of the term or where "the inventor has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction."   Id.  The Phillips court found a presumption in favor of dictionary definitions to be inconsistent with its rulings that "the specification is 'the single best guide to the meaning of a disputed term.'" Id. at 1321 (quoting Vitronics, 90 F.3d at 1582).  The Federal Circuit further explained that:

> The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent.  Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent.  Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.

Id. at 1321.  Although cautioning against giving undue weight to dictionaries, the court emphasized that judges may, in their discretion, make appropriate use of dictionaries within the context of intrinsic evidence.  Id. at 1322.

With this clarification by the Federal Circuit in mind, the Court now turns to whether the Intex I claim construction decision is consistent with the principles articulated in Phillips, and in particular the secondary role assigned to dictionaries.  This Court concludes that no change in the claim construction decision is warranted.  The decision is properly based primarily on the intrinsic evidence, and looked to dictionary definitions to "buttress" that conclusion, consistent with Phillips.  Hence, although this Court's discussion of claim construction post-Phillips would be somewhat different, the result of the analysis does not change.

The Court's claim construction decision began with a review of the legal standards generally governing claim construction.  Although Metalast is correct that the decision recited the presumption in favor of dictionary definitions from <u>Texas Digital</u>, the decision placed significant reliance on the principle that "courts 'should look <u>first</u> to the intrinsic evidence of record, <u>i.e.</u>, the patent itself, including the claims, the specification, and if in evidence, the prosecution history.'" <u>Intex I</u>, 245 F. Supp. 2d at 68-69 (quoting <u>Vitronics</u>, 90 F.3d at 1582) (emphasis added).

Thus, the first section of the Court's analysis looked only at intrinsic evidence -- that is, the claim language, the context of the language, and the drawings accompanying the patent.  The Court first observed that the claim language, standing alone, favored Intex's proposed construction of "smooth," although also noting that Metalast's proposed meaning of "unitary" or one-piece was not implausible.  <u>Id.</u> at 71.  The decision then analyzed the term "in the context of the other language of Claim 1," which strongly favored the construction of "smooth" for two reasons.  <u>Id.</u>  First, the term "uninterrupted" applies to and modifies only "inner surfaces," and not "sleeves."  <u>Id.</u>  This placement of the words strongly suggests that "the <u>surface</u> of the sleeves must be uninterrupted (and hence smooth), not that the sleeves must be uninterrupted (and hence arguably unitary)."  <u>Id.</u> (emphasis in original).  The decision further noted that "Metalast's position ultimately is really that the ladder rungs (having sleeves at each end) are to be unitary or one-piece," a construction "even further from the actual words as used in the claim, in which uninterrupted modifies surfaces, not sleeves, and certainly not ladder rungs."  <u>Id.</u> at 72.

The decision next looked at the phrase "for receiving therethrough said rigid uprights" which immediately follows the term "uninterrupted inner surfaces."  <u>Id.</u>  The Court found that this phrase further supported the conclusion that "uninterrupted inner surfaces" means "smooth"

8

because smooth inner surfaces will "facilitate sliding the uprights through them, whether or not the sleeves are unitary."  Id.  A unitary or one-piece sleeve, it was noted, would fail to serve this function if the sleeves have protrusions, gaps, or recesses.  Id.  The Court found that additional language throughout Claim 1 supported the interpretation of "uninterrupted" as "smooth" or "uniform" based on the differentiated language used to discuss the separate split sleeve, which had a "split," a "recess," and a "protrusion."  Id.

The decision also relied on the drawings that are part of the '041 patent as intrinsic evidence that further supported this construction.  Id.  The Court explained that Figure 1, which depicts the sleeve at the end of a rung, shows the "inner surface" of the sleeve as smooth.  Id.  Furthermore, Figure 2, an axial cut-out showing an elevational cross-section of the attachment of the rung to the upright, depicts the inner surface of the sleeve as smooth, but in contrast depicts the two parts of the uprights with gaps, recesses, and protrusions.  Id.

Based on this intrinsic evidence, the decision then stated that "the Court concludes that the ordinary meaning of 'uninterrupted inner surfaces' to one skilled in the art is considerably more likely to be 'smooth' than unitary,' given the words employed, their context, and the accompanying drawings."  Id.

Only after this initial construction did the Court consider dictionary definitions.  Id. at 73.  Although the Court again acknowledged that pursuant to Texas Digital there was (at the time) a presumption in favor of dictionary definitions, the Court did not rely on that presumption to reach its construction.  Rather, as recounted in detail above, the Court relied on the claim language and the drawings to reach the construction of "uninterrupted" as "smooth" or "uniform," and then considered whether the dictionary definitions were consistent with that construction.

This is reiterated in the final paragraph of the decision's section on dictionary definitions, which states:  "[T]he dictionary definitions are more consistent with an interpretation of 'uninterrupted inner surfaces' as meaning 'smooth or uniform', and hence provide support for that construction <u>as drawn, in the first instance, from the claim language and context itself</u>."  <u>Id.</u> at 74 (emphasis added).

The Court did give less weight to one type of intrinsic evidence -- the prosecution history -- a point on which Metalast now relies very heavily.  The Court conducted a detailed review of the prosecution history (aided by both sides' expert witness assessments), focusing on changes Metalast made to the claims to distinguish its ladder design from that granted to another ladder, U.S. Patent 1,349,125 ("the Full patent").  <u>Id.</u> at 75-78; <u>see</u> <u>also</u> Patent File History at M00670-76 (Casano Decl. Ex. B (filed Sept. 23, 2002) ("Patent File History")).  The Court concluded that "[t]he more persuasive reading of the prosecution history may be that it focuses on distinguishing the '041 patent from the Full patent in terms of simplicity of construction and number of parts, but there is also a plausible reading that it focuses on ease of sliding (<u>i.e.</u>, smooth surfaces without protrusions), which is likewise a simpler construction."  <u>Id.</u> at 78.  The Court further explained that the prosecution history was not dispositive because "[m]ore importantly, [it] is subject to some inherent doubt given that it was provided by a patent attorney attempting to overcome the examiner's rejection, but who did not rely on the original Spanish-language patent and cannot remember what he meant in any event."  <u>Id.</u>  Giving lesser weight to prosecution history where it is ambiguous is consistent with the recognition in <u>Phillips</u> that prosecution history is important but may be "less useful for claim construction purposes" in some circumstances.  <u>See</u> <u>Phillips</u>, 415 F.3d at 1317.  Indeed, the circumstances in this case are

precisely the context -- "an ongoing negotiation between the PTO and the applicant" -- that led the Phillips court to recognize the need for caution in relying on prosecution history.  See id. Thus, the Court properly exercised its discretion to give less weight to the prosecution history here.

Although some references to Texas Digital and similar cases were made in declining to give greater weight to the prosecution history over and above the "ordinary meaning" of the claim terms, the Court's intent -- as evidenced by the decision read in its entirety -- was to discount the prosecution history because of the flaws described above.  In addition, the "ordinary meaning" of the claim terms, as used in that section of the decision, clearly refers to the "ordinary meaning" discerned from the claim language, context, and drawings, as buttressed by dictionary definitions -- not to the "ordinary" dictionary meaning alone.  See id. at 78-79.

In summarizing the claim construction outcome, the Court again emphasized the paramount role of intrinsic evidence in ascertaining the ordinary meaning of the term to one skilled in the art of ladder design:

> [The] ordinary meaning, based on the claim language, context and drawings, as well as dictionary definitions, and confirmed by the extrinsic evidence of Ver Halen's expert testimony, is that "uninterrupted inner surfaces" means smooth or uniform inner surfaces of the sleeves located at the ends of the ladder rungs of the '041 patent.

Id. at 79.  Thus, based on this review of the claim construction decision, as well as the patent and prosecution history, the Court concludes that the methodology employed in the original decision is consistent with the clarified framework set out in Phillips because it relies primarily on intrinsic evidence to construe the claim and assigns only a secondary role to dictionary

definitions and other extrinsic evidence.  More importantly, consideration and application of Phillips in this case does not change the Court's claim construction determination.

## II.    Infringement under the Doctrine of Equivalents

Intex contends that it is entitled to summary judgment on the issue of noninfringement under the doctrine of equivalents because Metalast is estopped by the prosecution history from asserting the doctrine.  In the alternative, Intex contends that recovery based on infringement by equivalents is not available to Metalast because it would result in vitiation of a claim term and, in any event, is not supported by the record because the difference at issue (i.e., the grooved keyway) is not insubstantial.  The legal standards governing application of the doctrine of equivalents were explained in Intex II, slip op. at 9-11, and are repeated here as necessary to address the parties' arguments.

Under the doctrine of equivalents, a claim limitation not literally met may nonetheless be infringed upon by an element of the accused product based on equivalent identity of elements if the differences between the two are "insubstantial to one of ordinary skill in the art."  Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp., 320 F.3d 1339, 1351 (Fed. Cir. 2003); see Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co., 520 U.S. 17, 39-40 (1997).  "Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole."  Warner-Jenkinson, 520 U.S. at 29.  While no particular linguistic framework controls the inquiry (id. at 40), the "insubstantial differences" inquiry may be guided by determining "whether the element in the accused device performs substantially the same function in substantially the same way to obtain the same result as the claim limitation" --

also referred to as the function-way-result test. <u>Boehringer Ingelheim Vetmedica</u>, 320 F.3d at 1351 (internal citations and quotations omitted).

Prosecution history estoppel, however, may preclude a patentee's assertion of the doctrine of equivalents. <u>Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.</u>, 535 U.S. 722, 727 (2002). Estoppel ensures that when the patentee responds to a PTO rejection of his application by narrowing his claims, the prosecution history will estop him from later arguing that the subject matter covered by the original broader claim was nothing more than an equivalent to the patented claim. <u>Id.</u> In other words, the patentee may not claim that the surrendered territory should be deemed equivalent to the literal claims of the issued patent. <u>Id.</u> at 733-34. Estoppel has been discussed most often in the context of amendments made to avoid prior art. <u>Id.</u> at 735. However, <u>any</u> narrowing amendment made to satisfy any requirement of the Patent Act may give rise to an estoppel with respect to the amended claim limitation. <u>Id.</u> at 736.

The patentee bears the burden of establishing that an amendment was not made for reasons related to patentability. <u>Id.</u> at 739. "When the patentee is unable to explain the reason for amendment, estoppel not only applies but also 'bar[s] the application of the doctrine of equivalents as to that element.'" <u>Id.</u> at 740 (quoting <u>Warner-Jenkinson</u>, 520 U.S. at 33). The patentee also bears the burden of demonstrating that the amendment does not surrender the particular equivalent in question; in the absence of such a demonstration, a rebuttable presumption arises that estoppel bars a finding of equivalence. <u>Id.</u> at 740-41. In <u>Festo</u>, the Supreme Court explained that the presumption of estoppel is rebuttable because "[t]here are some cases . . . where the amendment cannot reasonably be viewed as surrendering a particular equivalent," and described three such situations: "[1] The equivalent may have been

13

unforeseeable at the time of the application; [2] the rationale underlying the amendment may bear

no more than a tangential relation to the equivalent in question; or [3] there may be some other

reason suggesting that the patentee could not reasonably be expected to have described the

insubstantial substitute in question."  Id.  Whether the patentee has rebutted the presumption of

surrender is a question of law for the Court.  Biagro Western Sales, Inc. v. Grow More, Inc., 423

F.3d 1296, 1305 (Fed. Cir. 2005).

Intex contends that, as a threshold matter, Metalast is estopped from asserting the

doctrine of equivalents because it relinquished the claim at issue during the patent application

process when it amended its claim to distinguish its ladder design from the Full patent and thus

satisfy Section 102(b) of the Patent Act.[3]  Metalast implicitly acknowledges, as it did during the

earlier briefing, that the presumption of prosecution history estoppel applies in this case absent a

showing by Metalast that the presumption should be rebutted, and the Court reaffirms here its

prior conclusion that estoppel applies.   See Intex II, slip op. at 12-15.  In relevant part, the Court

notes that, in response to Metalast's U.S. patent application submitted on August 29, 1994,[4] the

patent examiner rejected the original versions of Claims 1 through 5 under 35 U.S.C. § 102(b), as

being anticipated by the Full patent.  See PTO letter dated Sept. 11, 1995 (Patent File History at

M00666-67).  Metalast then filed an amendment on December 13, 1995 claiming that new

prosecution claims 6 through 10 (which became claims 1 through 5 in the issued '041 patent)

---

[3]  Section 102(b) states:  "A person shall be entitled to a patent unless -- . . . (b) the
invention was patented or described in a printed publication in this or a foreign country or in
public use or on sale in this country, more than one year prior to the date of the application for
patent in the United States . . . ."  35 U.S.C. § 102(b).

[4]  The U.S. application claimed priority from a Spanish application filed on September
21, 1993.  See Intex II, slip op. at 12 n.8.

were patentable over the Full patent, based on a number of distinctions, including rung "sleeves having uninterrupted inner surfaces," which it characterized as contributing, with the other aspects of its design, to simple construction, in contrast to the more complex construction of the Full ladder.[5]  Id. at M00674.  It is undisputed that the narrowing amendment was undertaken to satisfy Section 102(b).  Thus, a presumption of prosecution history estoppel applies to Metalast's assertion of the doctrine of equivalents.

The burden is on Metalast, then, to rebut the presumption of estoppel.  Festo, 535 U.S. at 739-40.  However, Metalast has come forward with nothing to rebut the presumption other than a cross-reference to its previously rejected argument that the amended claim language for "uninterrupted inner surfaces" bears no more than a "tangential relation" to the equivalent in

---

[5]  Metalast's amendment explained the distinction as follows with regard to the rung sleeve and its inner surfaces:

> [The] Applicants submit that the present invention is not anticipated by the Full patent. . . .
>
> The rungs in the Full patent are in the form of two plates 1 which are secured to the ropes or uprights by bolts 5.  Each plate 1 has semi-circular recesses 2 in which clamps 8 are set, see col. 2 lines 73-77, which would not constitute the sleeve 9 defined by claim 1 of the present invention.
>
> In the present invention, the rungs have apertures defined by sleeves 9 having uninterrupted inner surfaces for receiving therethrough rigid uprights.  The sleeve 9 of the rung slides over the split sleeve 5, which is axially aligned around the rigid upright 1 and engaged by recess 3 and protrusion 8, so as to position the rung 2 along the length of the rigid upright 1.
>
> In the Full patent, clamps 8 are provided with encircling grooves 9 and shoulders 10 for receiving the plates 1.  In order to secure the plates 1 to the rope additional securing i.e. other than the groove 9, is required by way of bolts 5.  See col. 2 line 98-103.

See Patent File History at M00673-74 (emphasis added).

question (a rung sleeve having an inner surface with a grooved keyway) because the purpose of

the amendment was to claim a rung sleeve "with fewer parts" and "without the need for bolting" --

in other words, a unitary one-piece rung sleeve.   See Metalast Mem. at 14-15 (incorporating by

reference Metalast Mem. at 15-24, filed Jan. 12, 2005).   In Intex II, slip op. at 14-15, the Court

rejected Metalast's attempt to evade the claim construction of "uninterrupted inner surfaces" as

smooth or uniform (rather than unitary or one-piece), and the Court adheres to that holding here.

To do otherwise would allow Metalast to claim as an "equivalent" that which was rejected during

the claim construction.   Indeed, application of prosecution history estoppel is particularly

appropriate in this case because, by amending the claim language to specify sleeves with

"uninterrupted inner surfaces" (defined as "smooth" or "uniform," without gaps or recesses), Intex

necessarily surrendered a claim to ladder designs with interrupted inner surfaces.   Metalast has

proffered no other rebuttal to the presumption that estoppel applies, and thus it is estopped from

asserting the doctrine of equivalents.

Even if Metalast were not estopped, the Court finds, as a matter of law, that Intex would

be entitled to judgment on the issue of infringement by equivalents.   Intex contends that

infringement by equivalents cannot be found here because it would result in vitiation of a claim

term and because the change in its accused ladder is not "insubstantial" to one of ordinary skill in

the art.   It is well-settled that "an accused product or process is not, as a matter of law, equivalent

to a limitation of the claimed invention if such a finding would entirely vitiate the limitation."

Freedman Seating Co. v. American Seating Co., 420 F.3d 1350, 1358 (Fed. Cir. 2005) (citing

Warner-Jenkinson, 520 U.S. at 29)); see Gaus v. Conair Corp., 363 F.3d 1284, 1291 (Fed. Cir.

2004) ("[a] particular structure can be deemed outside the reach of the doctrine of equivalents

because that structure is clearly excluded from the claims whether the exclusion is express or implied") (quotations omitted).  To determine whether a finding of equivalence would vitiate a claim limitation, "courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." Freedman Seating, 420 F.3d at 1359.  As noted earlier, equivalence must be assessed "on a limitation-by-limitation basis as opposed to from the perspective of the invention as a whole." Id. at 1358.

Here, the claim at issue, "uninterrupted inner surfaces," has been construed as "smooth" or "uniform," "without gaps, protrusions, or recesses."  Intex I, 245 F. Supp. 2d at 72.   It is undisputed that each sleeve of the accused Intex ladder has a recessed groove (also called a keyway) cut into the inner surface at a near ninety degree angle which runs vertically the length of the sleeve.  Declaration of Jon Ver Halen (filed July 22, 2005) ("Third Ver Halen Decl.)  ¶ 7.  The groove was approximately 1/8 inch wide in the ladders from the 2000 selling season, and approximately 5/16 inch wide for those sold in the 2001 selling season. Id.  The function of the groove is to prevent rotational movement, which is accomplished with another component called the sleeve anchor.  Id.  ¶ 9.   Thus, during the assembly process, when the sleeve anchor is inserted over the uprights and inserted into the step, the spline on the sleeve anchor ("sleeve anchor key") must be correctly aligned with the grooved keyway in the aperture in order for the sleeve anchor to slide into the aperture and lock.  Id.

An inner surface with a groove of this nature -- one cut into the inner surface at a near 90 degree angle -- cannot be the equivalent of an "uninterrupted inner surface" (as claimed in the

17

'041 patent and construed by the Court) without rendering the claim of "uninterrupted inner surfaces" meaningless because the claim would then encompass inner surfaces that are broken up by sudden gaps or recesses, which is expressly precluded by the claim construction.  Indeed, it would be difficult to imagine what an "uninterrupted inner surface" would be if the claim did encompass a surface with gaps or recesses.   Such vitiation of claim terms precludes a finding of infringement under the doctrine of equivalents as a matter of law. See Asyst Tech., Inc. v. Emtrak, Inc., 402 F.3d 1188, 1195 (Fed. Cir. 2005) (affirming summary judgment of noninfringement under doctrine of equivalents where finding "unmounted" equivalent to "mounted" would vitiate the claim term); Seachange Int'l, Inc. v. C-COR, Inc., 413 F.3d 1361, 1378 (Fed. Cir. 2005) (holding that accused product did not infringe as a matter of law where finding "indirect" interconnections equivalent to "direct" interconnections would vitiate the claim term).   Furthermore, the change cannot fairly be characterized as "insubstantial" to one of ordinary skill in the art because it requires proper alignment in order to allow the insertion of the sleeve anchor key into the keyway to create a locking mechanism -- a feature not present in the '041 patent and which, in fact, adds an additional step in the assembly of the product.  Third Ver Halen Decl. ¶¶ 9, 12.

Instead of addressing the rule against vitiation of claim elements, Metalast focuses on the purported irrelevance of preventing rotational movement of the upright because, in Metalast's view, other shapes -- an oval or a pear -- could prevent rotational movement and still be considered to have "uninterrupted inner surfaces."  Metalast Mem. at 18-19.  Those questions, though interesting, fail to address the issue of gaps and recesses presented by the accused product in this case.  No reasonable trier of fact could find that the gaps in the accused ladder are an

"insubstantial change" from the '041 patent without vitiating the claim of "uninterrupted inner surfaces."

## CONCLUSION

For the foregoing reasons, the Court denies Metalast's request for reconsideration of the claim construction decision and grants Intex's motion for summary judgment on noninfringement under the doctrine of equivalents.  These determinations, in conjunction with the decisions rendered in Intex I and Intex II on claim construction, literal infringement, and patent validity, result in a final resolution of all of the claims for relief presented by both parties in this matter.  A separate order has been issued on this date.


/s/
_____
JOHN D. BATES
United States District Judge

Dated:   November 17, 2005


Copies to:

William Charles Casano
Greenstein, Delorme & Luchs, P.C.
1620 L Street, Northwest
Suite 900
Washington, D. C.  20036
202-452-1400 (telephone)
202-452-1410 (fax)

David N. Makous
Thomas S. Kidde
Daniel C. Decarlo
Lewis Brisbois Bisgaard & Smith LLP
221 North Figueroa Street
Suite 1200
Los Angeles, California 90012-2601

Counsel for Plaintiff/Counter-defendant

John E. Curtin
12629 Lake Normandy Lane
Fairfax, Virginia 22030
703-266-9543 (telephone)
703-790-2623 (fax)

Martin G. Raskin
Joshua L. Raskin
Steinberg & Raskin, PC
1140 Avenue of the Americas
New York, New York 10036
212-768-3800 (telephone)
212-382-2124 (fax)

Counsel for Defendant/Counter-claimant